UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA SCOTT,

    Plaintiff(s),

v.

THE DETROIT MEDICAL CENTER and
CHILDREN'S HOSPITAL OF MICHIGAN,

    Defendant(s).
_____/

Case No. 07-11635

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [25]**

Plaintiff Donna Scott filed this action and alleges that Defendants Children's Hospital of Michigan ("CHM") and its parent corporation, The Detroit Medical Center ("DMC"), fired her in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and in violation of the Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101 et seq. Defendants assert that Plaintiff cannot make out a prima facie case for either claim. This matter comes before the Court on Defendants' motion for summary judgment. For the reasons set forth below, Defendants' motion is GRANTED.

**I.  Facts**

Plaintiff was hired by CHM as a Radiologic Technologist on November 1, 2004. (Def.'s Mot. at 1; Pl.'s Resp. at 1.) Her duties, per the job posting summary, included operating x-ray equipment and ensuring a safe radiation environment. (Def.'s Mot., Ex. 2.) One of the skills required to perform the job was "visual acuity to operate and utilize all

types of x-ray equipment and supplies in order to produce radiographs of acceptable diagnostic quality." (*Id.*) In addition to conducting standard x-ray exams, Plaintiff also conducted CT scans and used a portable x-ray unit to conduct exams throughout the hospital, including the Emergency Department, the Operating Room, Fluoroscopy, Orthopedics, and patient rooms. (Def.'s Mot. at 3; Scott Dep., Def.'s Mot., Ex. 1 at 116-17.) Plaintiff asserts that she rarely, if ever, performed some of these functions as part of her job, including working in Orthopedics, Fluoroscopy, and using the computer to track x-ray procedures. (Pl.'s Resp. at 10.)

When Plaintiff would conduct an x-ray exam, her duties included:

> 1) Identify the patient and review the x-ray requisition for accuracy; 2) Bring the patient to the exam room and prepare and position the patient in infant seat, toddler seat, or bucky as required; 3) Secure patient as necessary with chin or arm straps; 4) Insert x-ray film cassette with cassette appropriately marked as Right or Left; 5) Collimate the x-ray beam - i.e., use the collimation field light generated by the computer system to align the x-ray beam and film - so as to restrict the useful x-ray beam to the body part requiring examination and spare adjacent tissue from unnecessary exposure; 6) Set the technique - i.e., set the radiation exposure factors for the x-ray based on the size and body part of the child; 7) Visualize the child - i.e., keep the child in full view through the window between the exam area and x-ray console - to ensure that the child does not move, is secure and not in any respiratory or medical distress, and to determine when the child inspirates - i.e. takes a breath; 8) Perform the x-ray at the point of full inspiration; 9) Return patient to waiting room; 10) Identify x-ray cassettes(s) from exam at the PRID ID computer station - i.e., select correct patient and order from the modality work list or, if unable to load from the work list, manually enter the identification number and patient demographics; 11) Evaluate quality and content of x-ray images on the VIPS computer work station; 12) Archive the x-ray images on the VIPS computer and send to the PACS computer system with images in correct reading order and in correct body part orientation; 13) Verify the x-ray images from the exam on the PACS computer system; 14) If no Quality Check person is at the PACS work station, check images for quality; and sign the x-ray requisition for quality verification purposes; 15) Document film, repeat and waste counts. Also identify the exam room number and exam beginning and ending times; 16) Release patient.

(Def.'s Mot., Ex. 4 at ¶ 8.)

Plaintiff's duties when conducting a CT scan included:

> 1) Identify patient and review CT requisition for accuracy; 2) Bring patient to exam room and check vitals; 3) Continue monitoring with pulse ox as required; 4) Position patient on the CT table, using laser light to center patient; 5) Leave exam room and move to windowed control panel room; 6) Keep patient in constant view; 7) Communicate with patient as necessary via microphone; 8) Enter patient and exam information in the CT computer; 9) Move patient into CT scanner gantry or "doughnut"; 10) Bring up "scouts" - i.e., blue lined grids - on the computer; 11) Use scouts to prescribe slices for the scan; 12) Set protocols for the scan; 13) Review scouts and protocols; 14) Begin scan (may last from 5 minutes to 60 minutes); 15) Review and evaluate images (20-200 images produced per scan); 16) Document exam beginning and end times; 17) Release patient.

(Def.'s Mot., Ex. 4 at ¶ 13.)

In April 2005, Plaintiff suffered a sudden and complete loss of vision in both eyes due to multiple sclerosis and Leber's Hereditary Optic Neuropathy. (Def.'s Mot. at 4; Pl.'s Resp. at 1.) Plaintiff was hospitalized, and CHM granted Plaintiff a medical leave of absence effective April 15, 2005. (Def.'s Mot. at 5; Pl.'s Resp. at 1.) Although some of Plaintiff's vision returned while she was in the hospital, she is legally blind. (*Id.*) Her best corrected vision is 20/200 OD (right eye) and 20/400 OS (left eye). (Pl.'s Resp., Ex. B at 2.) Plaintiff has most of her peripheral vision, but some of her central vision and color vision is gone. (Pl.'s Resp. at 2.)

Plaintiff testified that shortly after she left the hospital, she contacted her supervisor, Rebecca Gutierrez, and sought to return to work. (Scott Dep., Def.'s Mot., Ex. 1 at 140.) Plaintiff felt at that time that she could perform her job without any accommodation for her vision loss. (*Id.*) Plaintiff also testified that Ms. Gutierrez conditioned Plaintiff's return to work on her ability to read the computer used to keep track of x-ray procedures, a computer

Plaintiff maintains she rarely used even before her vision loss. (*Id.* at 142-144.) Ms. Gutierrez testified that she required Plaintiff to obtain a medical release so that she could obtain a "return to work physical" from the Occupational Health Department. (Gutierrez Dep., Def.'s Mot., Ex. 7 at 39, 45.)

Plaintiff contacted the Michigan Commission for the Blind, which helped her to obtain a closed circuit television ("CCTV") device that helped her read by magnifying documents on a television screen. (Pl.'s Resp. at 2.) The Commission also referred Plaintiff to Visually Handicapped Services ("VHS"), where she underwent training and rehabilitation to help compensate for her vision loss. (Def.'s Mot. at 5; Pl.'s Resp. at 3.) Plaintiff's communications technology instructor at VHS, Vernon Griffon, communicated with Ms. Gutierrez in an effort to ease Plaintiff's transition back into the workplace. (Def.'s Mot. at 6; Pl.'s Resp. at 3.) Specifically, they discussed a technology called "Job Access with Speech Software" ("JAWS"), which reads aloud text on a computer screen. (Def.'s Mot., Ex. 12 at ¶ 6-7.) Because Defendants' computer systems were not Windows-based, however, Mr. Griffon determined that "JAWS was not an option for Ms. Scott in the workplace." (*Id.* at ¶ 7.) Plaintiff completed the VHS program on October 28, 2005. (Def.'s Mot. at 6; Pl.'s Resp. at 3.)

Plaintiff obtained a medical release from her doctor and was cleared by Defendants' Occupational Health Services to return to work with visual limitations. (Def.'s Mot. at 7; Pl.'s Resp. at 3.) Ms. Gutierrez was not sure if Plaintiff could safely or properly perform her job duties; nonetheless, she allowed Plaintiff to return to work. (Def.'s Mot., Ex. 4 at ¶ 24-25.) Plaintiff returned to work on November 1, 2005. (Def.'s Mot. at 7; Pl.'s Resp. at 3.)

Upon Plaintiff's return, CHM made several significant changes to Plaintiff's duties: she was assigned to the day shift, where greater supervision and assistance would be available; she was limited to performing standard x-ray exams only; she was not required to conduct CT scans; and she was not required to conduct portable x-ray exams or to rotate through the Emergency Department, Operating Room, Fluoroscopy, or Orthopedics. (Def.'s Mot. at 7; Pl.'s Resp. at 10.) Plaintiff used the CCTV device at work to read various printed documents. (Def.'s Mot. at 8; Pl.'s Resp. at 10.) The CCTV device could not be used to magnify a computer screen. Despite this, Plaintiff testified that she successfully could read a computer screen with her glasses and magnifier. (Scott Dep., Def.'s Mot. Ex. 1 at 151-52.)

Defendants allege that Plaintiff, upon her return to work, was unable to perform her job in a satisfactory manner. Plaintiff disputes a number of these allegations; for purposes of this motion, the Court will consider only those allegations that Plaintiff has not challenged.

Plaintiff admits that she could not see her patients during an x-ray exam. (Scott Dep., Def.'s Mot., Ex. 1 at 90.) She stated that while most people see the patient through the window during the exam, she "learned to adapt after [her] sight got bad." (*Id.* at 90-91.) As a result, she wouldn't be able to see if a baby went into respiratory distress or had a seizure while Plaintiff was at the x-ray console. (*Id.* at 93.) She also couldn't see when the baby would inspirate (i.e. breathe in), the time when the x-ray was supposed to be taken.[1] (*Id.* at 91.) Instead, Plaintiff would use one of two techniques: while she was in the room

---

[1] An x-ray must be taken at full inspiration so that the heart and lungs appear outlined and illuminated. (Def.'s Mot., Ex. 17 at ¶ 13.)

5

with the baby, Plaintiff would "breathe like the baby." Then, Plaintiff stated, "when I sucked air in, I knew the baby did." (*Id.*) If, on the other hand, the baby was crying, Plaintiff aurally would determine the moment of inspiration. (*Id.*)

Several of Plaintiff's co-workers became concerned regarding her job performance. Plaintiff routinely asked co-workers to read x-ray acquisition forms for her, set radiation exposure factors for her, stamp her x-rays, view and evaluate her x-rays, and input the necessary patient/exam information. (Def.'s Mot., Ex. 17 at ¶ 10; Ex. 18 at ¶ 10; Ex. 19 at ¶ 9; Ex. 20 at ¶ 9; Ex. 21 at ¶ 11.) Additionally, her co-workers felt Plaintiff was a danger to CHM's patients. (Def.'s Mot., Ex. 18 at ¶ 11; Ex. 19 at ¶ 15; Ex. 20 at ¶ 14; Ex. 21 at ¶ 14.) Plaintiff's coworkers expressed their concerns to Ms. Gutierrez. (Def.'s Mot., Ex. 4 at ¶ ¶ 35-40; Attachment C.)

A specific example of Plaintiff's allegedly dangerous performance occurred when a co-worker asked Plaintiff to secure an infant's head in a positioning device for an x-ray exam. Plaintiff secured the device in a way that the baby's face was tightly covered by one of the ear pads. (Def.'s Mot., Ex. 19 at ¶ 14.) The co-worker reported that the baby was unable to breathe and that Plaintiff did not seem to know what she had done. (*Id.*)

In another instance, Plaintiff was taking a chest x-ray of an infant that required two different angles. (Def.'s Mot., Ex. 19 at ¶ 13 and attached Ex. A.) A co-worker noticed that both x-rays were inadequate and had Plaintiff repeat the x-rays. (*Id.*) One of the repeat x-rays also was inadequate. (*Id.*) Nonetheless, the co-worker decided to send the x-rays to the doctor rather than to expose the patient to a fifth dose of radiation. (*Id.*) The doctor requested that Plaintiff be written up because the x-rays were "absolutely unacceptable." (*Id.*)

6

In nearly all instances, x-rays are reviewed for quality control by a "lead technologist" before they are sent to the radiologist. (Pl.'s Resp. at 4.) Two of Plaintiff's co-workers, both of whom are "lead technologists," expressed concern about Plaintiff's repeat rates (i.e. the percentage of x-rays she had to re-take). CHM's standard repeat rate was between 3-5%. (Def.'s Mot., Ex. 21 at ¶ 9; Pl.'s Resp. at 17.) Plaintiff's co-workers estimated that Plaintiff's repeat rate was between 25-35%. (Def.'s Mot., Ex. 22 at 65; Ex. 21 at ¶ 9.) Plaintiff offers no evidence to counter this assertion, but instead states that no documentary evidence supports her alleged repeat rate and that she never was told her individual repeat rate.

Defendants also maintain that Plaintiff could not set radiation exposure factors accurately. In support, Defendants cite an occurrence where one of Plaintiff's x-rays was unreadable. A lead technologist asked Plaintiff what radiation exposure factor she used, and Plaintiff replied that it was set at 3.2. (Def.'s Mot., Ex. 19 at ¶ 14.) Because the x-ray should have been readable at that setting, the lead technologist checked the machine and found that the exposure factor actually was set at 32. (*Id.*) This exposed the patient to ten times the amount of acceptable radiation. (*Id.*) Plaintiff again points out that she never was told of the incident and that Defendants have no documentary evidence to support this allegation. (Pl.'s Resp. at 17.) Plaintiff also notes that when this incident initially came to light, the factor numbers were reported as 3.0 and 30, settings that are not possible on the type of x-ray machine that was used. (*Id.*) Nonetheless, Plaintiff concedes that she could have set the exposure factor at ten times the proper setting. (*Id.*)

Plaintiff points out that, although Defendants now claim to have been concerned by her alleged mistakes, her personnel file contained no indication that her performance was

7

subpar. (Pl.'s Repl. at 15.) On April 17, 2006 (6 months after Plaintiff returned to work with limited vision), Ms. Gutierrez, in a performance evaluation, rated Plaintiff a 2 out of 4 for "Performance of job assignments" and rated Plaintiff's overall job performance as "Acceptable." (Pl.'s Resp., Ex. K.) Another evaluation completed by Ms. Gutierrez reported that Plaintiff "Meets Expectations" in every job performance category. (Pl.'s Resp., Ex. L.) Ms. Gutierrez conceded that when she completed the evaluations, she considered in part Plaintiff's performance after her return from medical leave. (Gutierrez Dep., Def.'s Mot., Ex. 7 at 114.)

Prior to February 2006, Ms. Gutierrez contacted a member of DMC's Disability Management Office, Juanita Johnson, and asked if Plaintiff could be re-located to another job. (Johnson Dep., Def.'s Mot., Ex. 30 at 9-11, 22.) Ms. Johnson was unable to find a job that Plaintiff could perform with her visual limitations. (*Id.* at 13.) Ms. Gutierrez followed up in March 2006 to see if Ms. Johnson had any success. (*Id.* at 14; Def.'s Mot., Ex. 7 at 80.) At this time, Ms. Gutierrez reported that the situation had worsened to the point where Plaintiff could no longer perform the essential functions of her job. (*Id.*) Ms. Johnson replied that she still had not found a suitable job for Plaintiff. (*Id.*)

Based on the concerns raised by Plaintiff's co-workers and on the advice of DMC Disability Management, Ms. Gutierrez referred Plaintiff to DMC Occupational Health for a vision-based "fitness for duty exam." (Def.'s Mot., Ex. 4 at ¶ 41.) Ms. Gutierrez received the results of the exam on April 28, 2006. (Pl.'s Resp., Ex. U.) The results of the exam did not contain a conclusion regarding Plaintiff's ability to perform her job, and simply stated that Plaintiff received "vision education." (*Id.*; Gutierrez Dep., Def.'s Mot., Ex. 7 at 81-84.) Additionally, however, an employee from Occupational Health, Jim Russell, sent an e-mail

to Christine Miska, a human resources employee, that discussed the results of the exam. (Def.'s Mot., Ex. 23.) The e-mail stated that Plaintiff had a visual acuity of less than 20/200 in both eyes, with corrective lenses, for both near and far vision testing. (*Id.*) It also concluded that Plaintiff had "an inability to perform any work function where vision or color discrimination is necessary to safely perform work duties." (*Id.*) Although Ms. Gutierrez did not see the initial e-mail, she did learn of the results at a later date. (Gutierrez Dep., Def.'s Mot., Ex. 7 at 82.)

In May 2006, Ms. Gutierrez scheduled a meeting with Plaintiff, Ms. Johnson, and Ms. Miska to discuss Plaintiff's visual limitations and their impact on her job performance. (Gutierrez Dep., Def.'s Mot., Ex. 7 at 84.) Due to a medical emergency, Plaintiff did not attend the meeting. (*Id.*) Ms. Gutierrez held a meeting with Ms. Johnson, Ms. Miska, and an ADA representative, but not with Plaintiff, to discuss the visual acuity requirements of Plaintiff's job and the patient safety concerns arising from Plaintiff's limited vision. (Def.'s Mot., Ex. 4 at ¶ 44.) After the meeting, Ms. Gutierrez determined that Plaintiff could no longer be allowed to work as a radiologic technologist. (*Id.*)

In June 2006, Plaintiff took a six-week leave of absence after she broke her arm. (Def.'s Mot. at 16; Pl.'s Resp. at 4.) Plaintiff returned to work on July 24, 2006. (Def.'s Mot. at 16; Pl.'s Resp. at 5.) On August 2, 2006, Ms. Gutierrez told Plaintiff that she could no longer work as a radiologic technologist and that she would be placed on a medical leave of absence. (*Id.*) The next day, Plaintiff signed and submitted a request for Medical Leave and a Short Term Disability Request Form. (Def.'s Mot., Ex. 25.) Plaintiff never submitted a claim for short-term disability and therefore did not receive any disability pay. (Def.'s Mot. at 16; Pl.'s Resp. at 5.)

Plaintiff filed this lawsuit in April 2007. (Def.'s Mot. at 16.) This matter is now before the Court on Defendants' motion for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

Plaintiff's claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101 et seq.  The ADA provides, in relevant part, that an employer shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The PWDCRA similarly provides that an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position."  Mich. Comp. Laws § 37.1202(b).  Because the PWDCRA "substantially mirrors the ADA . . . resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim."  *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002).

To establish a prima facie case of discrimination under the ADA, Plaintiff must show: 1) she has a disability; 2) she is "otherwise qualified" to perform the job requirements, with or without reasonable accommodation; and 3) she was discharged solely by reason of her handicap.  *Macy v. Hopkins County School Bd. of Educ.*, 484 F.3d 357, 363 (6th Cir. 2007).  Plaintiff is "otherwise qualified" if she can perform the "essential functions" of the job.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 n.8 (6th Cir. 1996).  Here, Defendants challenge Plaintiff's ability to meet the second prong of a prima facie case.

**A. Essential Functions of Plaintiff's Job**

It is Plaintiff's burden, in order to satisfy the second prong of a prima facie case, to establish that she is able to perform the "essential functions" of the job with or without a proposed reasonable accommodation. *Monette*, 90 F.3d at 1186. It is Defendants' burden, on the other hand, to prove that a particular job requirement is essential. *Id.* At the outset, then, the Court must determine the essential functions of Plaintiff's job.

An "essential function" is a fundamental job duty of the employment position. 29 C.F.R. § 1630.2(n)(1). A function may be considered essential "because the reason the position exists is to perform that function" and/or because the function is so "highly specialized . . . that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Id.* at § 1630.2(n)(2). Evidence of whether a job function is essential includes the employer's judgment, written job descriptions prepared before advertising or interviewing applicants for the job, the amount of time spent on the job performing the function, the consequences of not requiring the incumbent to perform the function, and the current work experience of incumbents in similar jobs. *Id.* at § 1630.2(n)(3).

Here, Plaintiff argues that only those duties to which she was assigned upon her return were essential functions of her job. Under this theory, Plaintiff's only essential job function would be to conduct standard x-ray exams and would not include CT scans, portable scans, or rotating through other departments. Various courts have addressed this type of argument and have concluded that, "even when an employer and employee have made arrangements to account for the employee's disability, a court must evaluate the essential functions of the job without considering the effect of the special arrangements." *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 25 (1st Cir. 2001). *See also*

*Basith v. Cook County*, 241 F.3d 919, 930 (7th Cir. 2001) (delivery remained essential function of job even though employer created position that did not require employee to deliver); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175-76 (10th Cir. 1999) (relevant functions are those of job for which employee was hired, not job to which employee was assigned); *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1528 (11th Cir. 1997) (employer's decision to cease making accommodations that pertained to the essential functions of employee's job did not violate the ADA). The Court is persuaded by the reasoning of these decisions, for "[t]o find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of the employers." *Phelps*, 251 F.3d at 26. The Court, then, will assess the essential functions of Plaintiff's job based on the job for which she was hired, not on the job she performed after her vision loss.

Plaintiff argues that many of the duties she allegedly performed before her vision loss were in fact performed rarely or not at all; specifically, Orthopedics, Fluoroscopy, and using the computer to track x-ray procedures. (Pl.'s Resp. at 10.) Plaintiff does not deny that before her vision loss she conducted CT scans, portable x-ray exams, and rotated through the Operating Room and Emergency Department. She does, however, challenge the essential nature of these duties.

Regarding CT scans, Plaintiff argues that they cannot be considered essential because "only nine of the twenty-nine radiologic technologists were trained to do CT scans." (Pl.'s Resp. at 11.) Even so, Plaintiff was one of the nine employees who performed CT scans, and before her vision loss she split her time between CT scans and x-rays. (Scott Dep., Def.'s Mot., Ex. 1 at 116-17.) Plaintiff also contends that CT scans

13

were not essential because Defendants trained her replacement to conduct CT scans. (Pl.'s Resp. at 11.) Rather than support Plaintiff's assertion, this serves to underscore that CT scans were in fact an essential part of Plaintiff's job. As to her alleged inability to perform in the Operating Room and to conduct portable exams, Plaintiff's sole argument is that the functions were not essential because they could easily be performed by other employees. (*Id.* at 10.)

Based on the foregoing, no reasonable juror could conclude that Plaintiff's essential job functions did not include conducting CT scans, portable x-ray exams, and rotating through the Operating Room and Emergency Department. Plaintiff's job exists, at least in part, to perform these functions. Furthermore, Plaintiff's employer (Defendants) considers the functions to be essential, and Plaintiff does not dispute that she split her time between x-rays and these other functions before her vision loss. Moreover, the consequence of not requiring Plaintiff to perform these functions was that another employee had to fill in. Finally, every technologist was expected "to rotate through all of the areas whether they like working those areas or not." (Def.'s Mot., Ex. 22 at 35.)

Accordingly, the Court determines that the essential functions of Plaintiff's job included conducting x-ray and CT scans, portable x-ray exams, and rotating through the Operating Room and Emergency Department. Additionally, Plaintiff concedes that another essential function of her job was the visual acuity to "produce acceptable x-ray results." (Pl.'s Resp. at 11.)

### B. Reasonable Accommodations

Having determined the essential functions of Plaintiff's job, the Court must now consider whether Plaintiff has shown that she could perform these essential functions with

14

or without reasonable accommodations. Plaintiff "bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." *Monette*, 90 F.3d at 1183 (emphasis original). If Plaintiff makes this showing, the burden shifts to Defendants to show that the accommodation would impose an undue hardship. *Id.*

A reasonable accommodation may include job restructuring, acquisition or modification of equipment or devices, the provision of qualified readers, and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9)(b). That said, "[t]he ADA does not require that an employer exempt a disabled employee from an essential function of the job as an accommodation." *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998). Here, Plaintiff attempts to frame Defendants' choice to reduce her job requirements as "their voluntary and unilateral accommodation of her vision restrictions." (Pl.'s Resp. at 11.) Because her pre-disability duties were essential functions of her job, however, this argument is unavailing.

The only other accommodation Plaintiff claims to have proposed is the JAWS software program that reads aloud text on a computer screen. (Compl. at ¶ 12.) Plaintiff testified, however, that the alleged request was made on her behalf by Mr. Griffon. (Scott Dep., Def.'s Mot., Ex. 1 at 185, 189.) Mr. Griffon, however, stated that although he discussed the use of JAWS with Ms. Gutierrez, he "determined that JAWS was not an option for Ms. Scott in the workplace since the computer systems used in her department were not standard Windows-based applications." (Def.'s Mot., ex. 12 at ¶ 7.)

Because Plaintiff did not propose any reasonable accommodations that would allow her to complete the essential functions of her job, the sole remaining question before the Court is whether Plaintiff could perform the essential functions without accommodation.

Plaintiff has presented sufficient evidence to create a genuine issue of material fact regarding her ability to perform standard x-ray examinations without accommodation. Despite numerous incidents that caused concern among Plaintiff's co-workers and supervisor, Plaintiff received two satisfactory job evaluations after she returned to work with vision loss and was allowed to work as a radiologic technologist for a period of nine months after her return. Based on these facts, a reasonable jury could conclude that Plaintiff was able to perform standard x-ray examinations with no accommodation.

Plaintiff has offered no evidence, however, that she could perform the remaining essential functions of her position without accommodation. While Plaintiff asserts that she believes she could have conducted CT scans and performed in the Operating Room and Emergency Department if given the chance, she has provided no evidence to support her claims. Such unsupported assertions are insufficient to withstand summary judgment.

Plaintiff cannot establish a prima facie case of discrimination under the ADA because she cannot show that she could perform the essential functions of her job with or without reasonable accommodation. Plaintiff's claim under the PWDCRA fails for the same reason. Accordingly, Defendants' motion for summary judgment is GRANTED.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.


       s/Nancy G. Edmunds
       Nancy G. Edmunds
       United States District Judge

Dated: January 22, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 22, 2008, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager